UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

KENDALL KING,                    §
                                 §
        *Plaintiff*,             §
                                 §
v.                               §          CIVIL ACTION H-11-4488
                                 §
SANDERSON FARMS, INC.,           §
                                 §
        *Defendant*.             §

MEMORANDUM OPINION AND ORDER

Pending before the court is defendant, Sanderson Farms, Inc.'s ("Sanderson Farms") motion for summary judgment.  Dkt. 28.  After considering the motion, response, reply, record evidence, and applicable law, the court is of the opinion that the motion should be GRANTED.

I. BACKGROUND

As an overview, plaintiff brings disability discrimination, retaliation, and hostile work environment claims against Sanderson Farms based on his employment as a utility hand from August 2009 to October 2010.  Plaintiff alleges he was discriminated against based on his disability, namely a learning impairment and dyslexia, which made reading and writing difficult for him.  Sanderson Farms was aware that plaintiff had difficulty reading and writing; however, proficient reading and writing were not major components of plaintiff's job as a utility hand.  Plaintiff was primarily responsible for cleaning the shop, assisting the mechanics, and generally doing what was asked of him by his supervisor or the mechanics.  Plaintiff cites a few particular instances of alleged discriminatory treatment and argues that he was verbally mistreated by his immediate supervisor, reprimanded, and ultimately, terminated based on his disability and in retaliation for reporting sexual harassment.  According to Sanderson Farms, plaintiff was terminated after committing four

workplace violations within a one year period as required by defendant's progressive disciplinary policy.

Specifically, plaintiff applied for a utility hand position at Sanderson Farms when his brother told him about the opening.[1]  Plaintiff brought his mother to Sanderson Farms to help him read and complete the application.[2]  During the interview, he told his future supervisor, Russell Cooper, that he had trouble reading and writing and had previously been enrolled in special education classes.[3]  Plaintiff was hired and began work as a utility hand for Sanderson Farms in August 2009 in the truck shop where company vehicles were serviced and repaired.[4]

When plaintiff was hired, he went through the standard training and orientation session conducted for all new hires.[5]  During this orientation, records clerk, Evelyn Oder, read plaintiff the company's Equal Employment Opportunity and Non-Discriminatory Policy and Harassment Policy and Reporting Procedure.[6]  Both policies prohibit discrimination based on disability, as well as retaliation for engaging in protected activity.[7]  Both policies also contain specific reporting

---

[1]  Dkt. 40, Ex. 6, Deposition of Kendall King ("King Depo."), p. 59.

[2]  *Id.* at pp. 62-70.

[3]  *Id.* at 73.

[4]  *Id.* at p. 59, Exs. 6-7.

[5]  Dkt. 40, Ex. 11; Dkt. 28, Ex. C, Deposition of Evelyn Oder ("Oder Depo."), pp. 13-14.

[6]  *Id.* at pp. 13-15.

[7]  Dkt. 28, Ex. B, Declaration of Jennifer Buster ("Buster Decl."), Exs. 1-2.

procedures, emphasizing that Sanderson Farms must be notified of discriminatory or harassing conduct so that it can investigate the matter.[8]  The policies provide, in relevant part:

> Employees who believe they have been harassed by a coworker, supervisor, or representative of Sanderson Farms . . . must immediately report the facts of the incident(s) to either the Field Employee Relations Manger, Division Manager, or Superintendent at the employee's location.  If the employee is unable to locate these individuals or believes it inappropriate to notify them for any reason, the employee must immediately contact the Human Resources Department at the General Office at 1-800-844-4030.  Employees should never assume that Sanderson Farms is aware of the situation.[9]

These policies were not only read to plaintiff by Oder, but he was given copies and they were posted in the break room of the truck shop.[10]  Plaintiff also signed an acknowledgment of receipt and understanding of these policies.[11]

The utility hand position was an unskilled labor position requiring very little reading and writing.[12]  There was no formal job description, but plaintiff was expected to clean the shop, store parts, and generally assist the mechanics around the shop.[13]  It appears that in December 2010, Cooper prepared a list of job tasks for which plaintiff was responsible.[14]  Plaintiff's signature appears

---

[8]  *Id.*

[9]  *Id.*

[10]  *Id.*

[11]  King Depo., pp. 76-77, Ex. 7; Oder Depo., pp. 33, 50.

[12]  Dkt. 28, Ex. D, Deposition of Russell Cooper ("Cooper Depo."), pp. 16-17.

[13]  King Depo., pp. 99-100; Cooper Depo., p. 17.

[14]  Dkt. 28, Ex. F; Cooper Depo., pp. 17-19.

on this memo; however, plaintiff denies that is his signature.[15] It is undisputed that plaintiff was able to perform the essential functions of his job.

On October 20, 2009, plaintiff received his first written reprimand for failing to date incoming invoices as required by Sanderson Farms' policy.[16] Plaintiff was written up for the same violation on November 27, 2009.[17] Plaintiff did not recall being written up for these violations, but his signature appears on the formal reprimand forms, which warned him that "[a]nother incident of substandard work performance" would result in a "Formal Warning" and then "suspension."[18] Cooper and other employees had also previously been written up for this same violation.[19]

A couple of months after plaintiff began working at Sanderson Farms, he reported a particular incident involving Frank Sanford, a yard man at the processing plant. Sanford did not work in the truck shop where plaintiff worked and had no reason to be there.[20] However, he would go down to the truck shop to hang out with the mechanics.[21] During one night shift when Sanford was in the break room of the truck shop, he rubbed plaintiff's back and rubbed his radio antenna against plaintiff's neck and ear.[22] Plaintiff asked Sanford to stop, but he just laughed.[23] Harry Davis

---

[15] Dkt. 40, p. 32.

[16] King Depo., Ex. 10.

[17] *Id.* at Ex. 11.

[18] *Id.* at Exs. 10-11.

[19] Cooper Depo., pp. 31-35, 100.

[20] *Id.* at pp. 104-06.

[21] Dkt. 40, Ex. 22.

[22] King Depo., p. 109.

[23] *Id.*

and Junior King (plaintiff's brother) observed the incident and recalled plaintiff looking very uncomfortable.[24]   Junior and Davis advised plaintiff to tell Cooper that Sanford was sexually harassing him.[25]  Plaintiff immediately advised Cooper about the incident and asked Cooper to take care of it.[26] Cooper testified that he advised plaintiff to report the incident to the Field Employee Relations Manager pursuant to the harassment policy.[27]  Cooper testified he called Sanford's boss and told him not to allow Sanford to come to the truck shop anymore, but did not report the incident to Human Resources.[28]

Plaintiff testified that Cooper told him he would talk to Sanford's boss, but plaintiff did not hear that anything had been done to resolve the issue.[29]  When plaintiff asked if Cooper had done anything and Cooper replied that he had not, plaintiff went directly to Sanford's boss to complain.[30] Plaintiff told Sanford's boss about the incident and asked him to do something about it.[31]  Sanford's boss replied that he would take care of it.[32]  Although the incident was never formally investigated by Sanderson Farms, plaintiff provided different accounts of what occurred thereafter.  At one point, plaintiff testified that Sanford stopped coming to the truck shop after his report of the incident to

---

[24] Dkt. 40, Ex. 20.

[25] *Id.*

[26] King Depo., pp. 108, 111-12.

[27] Cooper Depo., pp. 27-28, 113.

[28] *Id.* at pp. 27, 112-13.

[29] King Depo., p. 111.

[30] *Id.* at pp. 113, 122-23.

[31] *Id.* at 115-17.

[32] *Id.*

Sanford's boss.[33]  At another point, plaintiff stated that Sanford did return to the shop and stare at plaintiff, making him uncomfortable.[34]  Plaintiff would also leave the truck shop when he saw Sanford coming.[35]

In June 2010, plaintiff was moved to the day shift.[36]  The day shift involved greater direct interaction between plaintiff and his supervisor, Russell Cooper.[37]  Although it is undisputed that Cooper was rarely at the truck shop,[38] plaintiff claims that Cooper persistently verbally abused him in front of other employees with comments like "well at least I don't f*ck goats," "where have you been–over there f*cking the chickens," "you need to get off your ass and quit f*cking goats and farm animals–and leave those chickens alone."[39]  Plaintiff testified that, at first, Cooper teased him once a week, but then it increased in frequency to every other day.[40]  Cooper admitted that he probably made those sort of comments to plaintiff, but that they were the same sort of general shop talk engaged in between all of the guys, including plaintiff.[41]  Numerous mechanics and other employees

---

[33] *Id.* at pp. 110-11, 118-19, 177.

[34] *Id.* at pp. 178-79.

[35] *Id.* at 179.

[36] Dkt. 40, Ex. 17.

[37] *Id.* at Ex. 4.

[38] King Depo., pp. 155-56.

[39] Dkt. 40, Ex. 4; King Depo., pp. 129, 131.

[40] *Id.* at 131-32.

[41] Cooper Depo., pp. 109-11.

stated that these comments were typical around the truck shop.[42]  Keith Gilbreath, a mechanic, noted that the bad language towards the other mechanics was "more work related–not really sexual about farm yard animals except for Kendall."[43]

Plaintiff also found a note laying on the table in the break room, which read "Kendall f\*cks goats and barnyard animals. P.S. You stupid trick."[44]  It was also posted on the wall and on plaintiff's clip board.[45]  Although plaintiff asked Cooper to address this note, Cooper admitted he did not report it to Human Resources.[46]  Instead, Cooper called all the employees in and told them to leave plaintiff alone.[47]

Plaintiff also claims that Cooper made comments regarding the pace of his work and commented directly on his ability to read and write.  Specifically, Cooper would make comments like "what have you been doing all day–hurry up."[48]  Cooper also inquired about misspellings in plaintiff's work orders, and on one occasion, crumpled up one of plaintiff's work orders and threw

---

[42]  *Id.*; Dkt. 28, Ex. I, Deposition of Kim Knight ("Knight Depo."), Exs. 2-4, 6, 10; Dkt. 28, Ex. E, Deposition of Harry Davis ("Davis Depo."), p. 40.

[43]  Dkt. 40, Ex. 23.

[44]  *Id.* at Ex. 4.

[45]  King Depo., pp. 129, 158-59.

[46]  Dkt. 40, Ex. 24.

[47]  Knight Depo., Exs. 11-12.

[48]  Dkt. 40, Ex. 4.

it in the trash after stating "I can't read this."[49] Cooper testified he reviewed all of his employees'
work orders for mistakes and corrected them.[50]

Shortly before his termination, plaintiff received his final two reprimands resulting in his
termination. Although plaintiff denies that it was his responsibility to lock up the tire rack at the end
of the day, plaintiff was written up for not doing so on October 19, 2010.[51] The key to the tire rack
was kept in the break room, so everybody had access to the key and the ability to lock up the tire
rack.[52] Further, the job description prepared by Cooper and allegedly signed by plaintiff included
locking up the tire rack as one of plaintiff's job duties.[53] For this violation, Cooper testified that he
attempted to only make a note to plaintiff's file, instead of preparing a formal write-up; however, the
Field Employee Relations Manager told Cooper he was required to suspend plaintiff as the next step
in the disciplinary policy because this third violation occurred within a year of plaintiff's last
violation.[54] Plaintiff signed the disciplinary form associated with this write-up, and he was warned
that "[t]his [was] unsatisfactory work performance and [would] be subject to further disciplinary
action up to and including termination."[55]

---

[49] *Id.*

[50] Cooper Depo., pp. 129-30.

[51] King Depo., p. 136, Ex. 12.

[52] *Id.* at p. 183.

[53] Dkt. 28, Ex. F.

[54] *Id.* at Ex. 12; Cooper Depo., pp. 75-77.

[55] King Depo., Ex. 12.

Finally, plaintiff was written up, along with two other mechanics, for sitting in the break room and not opening the shop doors after clocking in on October 23, 2010.[56]  Again, plaintiff claimed that it was not his duty to open the shop doors, but rather it was the job of whichever mechanic arrived first.[57]  Plaintiff's pay was docked for the time he did not work that morning, and he was terminated on October 28, 2010.[58]  Plaintiff refused to sign the termination form.[59]

Prior to this final incident, in September 2010, Cooper issued a memorandum to all truck shop employees setting forth the company's expectations that all employees clock in and be ready to work at their starting time and that they should clean up and lock up tools before leaving for the day.[60]  Plaintiff acknowledged receiving this memorandum.[61]

Before plaintiff was terminated, a new utility hand, Samuel Oder, was hired on October 22, 2010.[62]  Cooper testified that Oder was hired in order to have a utility hand for both the day and night shifts, but he ultimately replaced plaintiff.[63]

Plaintiff filed an EEOC complaint after being terminated from Sanderson Farms in February 2011.[64]  Defendant claims it was not until the filing of the EEOC complaint that it became aware of

---

[56]  Cooper Depo., pp. 78-81; King Depo., Ex. 13.

[57]  *Id.* at p. 146.

[58]  *Id.* at Ex. 13.

[59]  *Id.*, p. 139.

[60]  *Id.* at pp. 95-99, Ex. 9.

[61]  *Id.*

[62]  Dkt. 40, Ex. 34.

[63]  Cooper Depo., p. 105.

[64]  *Id.* at Ex. 17.

the Sanford incident and plaintiff's complaints regarding Cooper.[65]   Once learning of these

allegations, defendant conducted an investigation and terminated Cooper on February 14, 2011 for

sexual harassment.[66]   Plaintiff's lawsuit in this matter was filed on December 19, 2011.

## II.  LEGAL STANDARD

Summary judgment is proper if "the movant shows that there is no genuine dispute as to any

material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a);

*Carrizales v. State Farm Lloyds*, 518 F.3d 343, 345 (5th Cir. 2008).  The moving party bears the

initial burden of informing the court of evidence, if any, that demonstrates the absence of a genuine

dispute of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548 (1986).  Only

when the moving party has discharged this initial burden does the burden shift to the non-moving

party to demonstrate that there is a genuine dispute of material fact.  *Id.* at 322.  A dispute is

"genuine" if the evidence is such that a reasonable jury could return a verdict for the nonmoving

party.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505 (1986); *Cooper Tire

& Rubber Co. v. Farese*, 423 F.3d 446, 454 (5th Cir. 2005).  A dispute is "material" if its resolution

could affect the outcome of the action.  *Anderson*, 477 U.S. at 248.  The substantive law determines

the facts which are material in each case.  Lastly, in determining whether a genuine dispute of

material fact exists, the court views the evidence and draws inferences in the light most favorable

to the nonmoving party.  *See id.* at 255; *Richardson v. Monitronics Int'l, Inc.*, 434 F.3d 327, 332 (5th

Cir. 2005).

---

[65]  Buster Decl., ¶7.

[66]  *Id.* at Ex. 4.

10

### III. Analysis

#### A. ADA Discrimination

The American with Disabilities Act ("ADA") provides that no employer shall discriminate against a qualified individual on the basis of disability in regard to "the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). For an ADA discrimination claim involving an adverse employment action where there is no direct evidence of discrimination, the court uses the burden-shifting framework set out in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S. Ct. 1817 (1973). *E.E.O.C. v. Chevron Phillips Chem. Co.*, 570 F.3d 606, 615 (5th Cir. 2009). Under this framework, the plaintiff must first establish a prima facie case of discrimination. *Id.* at 615. In order to establish a prima facie case of discrimination under the ADA, plaintiff must show that: (1) he suffered from a disability or was regarded as disabled; (2) he was qualified for the job that he held; (3) he was subjected to an adverse employment action based on his disability or perceived disability; and (4) he was replaced by a non-disabled person or was treated less favorably than non-disabled employees. *Id.* If the plaintiff succeeds, then the employer must articulate a legitimate, non-discriminatory reason for the adverse employment action. *Id.* If the employer meets its burden, then the burden of production shifts back to the plaintiff to show that the defendant's proffered reason was a pretext for unlawful discrimination. *Id.* A prima facie case coupled with a showing that the proffered reason was pretextual will usually be sufficient to survive summary judgment. *Daigle v. Liberty Life Ins. Co.*, 70 F.3d 394, 396 (5th Cir. 1995).

Defendant concedes, for the purposes of summary judgment, that plaintiff has made a prima facie case of disability discrimination under the first step of the *McDonnell Douglas* framework.

11

Dkt. 28, p. 15.  Defendant, however, asserts that it is still entitled to summary judgment because it has proffered a legitimate, non-discriminatory reason for plaintiff's termination, and plaintiff has failed to demonstrate that a genuine issue of material fact exists showing the reasons underlying his termination were a pretext for disability discrimination.

Assuming that plaintiff has established his prima facie case, defendant must present a legitimate, non-discriminatory reason for plaintiff's termination.  "This burden is one of production, not persuasion; it can involve no credibility assessment."  *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142, 120 S. Ct. 2097 (2000).  Here, defendant has clearly met its burden.  As an employee of Sanderson Farms, plaintiff was subject to the progressive disciplinary policy.  If an employee received four policy infractions within a one year period, he was subject to termination.  This policy was read to plaintiff by Evelyn Oder, and signed by him, acknowledging his understanding.[67]  Plaintiff received four disciplinary write-ups over the course of one year for various substandard work performance issues.  "Poor work performance is a legitimate, non-discriminatory reason for discharge."  *Perez v. Region 20 Educ. Serv. Ctr.*, 307 F.3d 318, 326 (5th Cir. 2002); *see also Wallace v. Methodist Hosp. Sys.,* 271 F.3d 212, 220 (5th Cir. 2001) (a violation of employer's written policies that could result in termination is a legitimate, non-discriminatory reason for termination under Title VII).  The multiple performance violations within a year under the terms of Sanderson Farms' written progressive disciplinary policy are sufficient to establish a legitimate, non-discriminatory reason for the adverse action taken against plaintiff.

Because defendant has successfully articulated a legitimate reason for plaintiff's termination, the burden now shifts back to plaintiff to show an issue of fact as to whether defendant's reasons are

---

[67] Oder Depo., Ex. 2.

pretext for discrimination.  To show pretext, plaintiff must produce substantial evidence to create a reasonable inference that the proffered reasons are false or unworthy of credence. *Auguster v. Vermilion Parish Sch. Bd.*, 249 F.3d 400, 403 (5th Cir. 2001).  Under the ADA, "discrimination need not be the sole reason for the adverse employment decision, [but] must actually play a role in the employer's decision-making process and have a determinative influence on the outcome." *Pinkerton v. Spellings*, 529 F.3d 513, 518 n.29 (5th Cir. 2008) (citation omitted).

Plaintiff points to the following evidence as proof of pretext:  (1) the disciplinary actions taken against him were unwarranted; (2) Cooper targeted him by changing his schedule and moving him to the day shift; and (3) defendant hired another utility hand (who ultimately replaced plaintiff) before plaintiff committed the violation for which he was terminated.  This evidence, however, does not demonstrate that defendant's decision to terminate plaintiff was motivated by discriminatory animus.  The disciplinary actions and change in plaintiff's schedule are not proof of pretext because others outside of the protected class were treated similarly to plaintiff.  And, plaintiff has provided no evidence outside of his subjective beliefs that his replacement was hired for anything but legitimate reasons.

Specifically, within months of being hired, plaintiff was written up twice for the same violation for failing to date incoming invoices.  He did not receive his next written reprimand until almost a year later for failing to lock up the tire rack.  Because of the length of time that had elapsed since plaintiff's previous write-up, Cooper attempted to only make a note to plaintiff's file regarding this violation; however, the Field Employee Relations Manager told Cooper he was required to suspend plaintiff as the next step in the disciplinary policy because the infraction occurred within one year of his previous violation.  Plaintiff was terminated shortly thereafter when he clocked in

and failed to open the shop doors and begin work.  In this case, it is no proof of discrimination that Sanderson Farms adhered strictly to its progressive disciplinary policy when plaintiff violated policy and exhibited poor work performance.

Notably, plaintiff does not deny committing any of these violations, but rather claims not to remember these incidents. He also denies that any of these actions were his job duties.  However, the evidence shows that plaintiff was expected to do what he was told and what was needed around the truck shop.  Plaintiff did not have a formal or detailed job description, but he cannot avoid responsibility for not completing tasks properly or violating policy when he admits he commonly performed tasks that were not his job, e.g. changing oil or tires.  Further, plaintiff was written up for the same violation twice, which belies his argument that he did not know he was supposed to date incoming invoices.  Plaintiff was also not the only employee to be cited for these infractions.  His supervisor and other employees were also previously written up for failing to date invoices, and two mechanics were written up for the same incident that resulted in plaintiff's termination.  The final violation included not only not opening the shop doors (which plaintiff disclaims was his responsibility), but failing to begin work after clocking in.  Working after clocking in was clearly within the purview of plaintiff's job description, and all employees were specifically informed of this when Cooper disseminated such requirements to all truck shop employees in September 2010.

Finally, plaintiff maintains that pretext can be found based on defendant's hiring his replacement one day before the violation that resulted in his termination.  The only evidence of record regarding plaintiff's replacement, outside of plaintiff's subjective beliefs, is Cooper's testimony that another utility hand was hired in order to have two utility hands to cover the day and night shifts.  This reason is certainly not incredible or lacking in credence.  And, an employee's

subjective belief of discrimination alone is not sufficient to warrant judicial relief.  *Grimes v. Tex.*

*Dep't of Mental Health and Mental Retardation*, 102 F.3d 137, 139 (5th Cir. 1996) (conclusory

allegations, unsubstantiated assertions, and subjective beliefs insufficient to support discrimination

claim).   The evidence presented by plaintiff simply does not demonstrate any discriminatory intent

on the part of defendant related to plaintiff's disability.  Plaintiff only relies on his subjective beliefs

that the motivating factor underlying his termination was rooted in discrimination, and that alone,

does not carry his burden to show pretext under these circumstances.

     **B.**    **Accommodation**

     Under the ADA, discrimination also includes "not making reasonable accommodations to

the known physical or mental limitations of an otherwise qualified individual with a disability." 42

U.S.C. § 12112(b)(5)(a); *Griffin v. United Parcel Serv., Inc.*, 661 F.3d 216, 224 (5th Cir. 2011).  An

employee who needs an accommodation because of a disability must inform his employer of the

limitations caused by his disability and suggest reasonable accommodations.  *See E.E.O.C. v.*

*Chevron Phillips Chem. Co.*, 570 F.3d 606, 621 (5th Cir. 2009) (finding "[t]he employee must

explain that the adjustment in working conditions or duties she is seeking is for a medical

condition-related reason"); *Taylor v. Principal Fin. Group*, 93 F.3d 155, 165 (5th Cir. 1996).  While

the employee must explain the limitations and suggest adjustments in working conditions or duties

necessary to accommodate for the limitation, the employee does not have to mention the ADA or

use the words "reasonable accommodation."  *Chevron Phillips*, 570 F.3d at 621.

     Plaintiff testified that his only disability is difficulty reading and writing.  It is undisputed that

Plaintiff did not request any type of accommodation.  Plaintiff argues that Sanderson Farms should

have recognized plaintiff's limitations and suggested adjustments in plaintiff's duties in order to

15

accommodate for his limited reading and writing skills. Plaintiff relies on language used by the Fifth Circuit and other courts that an employer may have a duty, especially in cases of mental illness, to propose or offer accommodations when the limitations of a disability are open, obvious, and apparent to the employer. *See Bultemeyer v. Fort Wayne Cmty. Sch.*, 100 F.3d 1281, 1285 (7th Cir. 1996) ("In a case involving an employee with mental illness, the communication process becomes more difficult. It is crucial that the employer be aware of the difficulties, and 'help the other party determine what specific accommodations are necessary.'" (citations omitted)); *Taylor v. Phoenixville Sch. Dist.*, 184 F.3d 296, 312 (3rd Cir. 1999) (relying on *Bultemeyer*); *Loulseged v. Akzo Nobel, Inc.*, 178 F.3d 731, 736 n.5 (5th Cir. 1999) (citing *Taylor v. Phoenixville Sch. Dist.* and *Bultemeyer*). Courts have reasoned that some mentally ill employees may not be fully aware of the limitations their conditions create, or be able to effectively communicate their needs to an employer, so that the employer may have an extra duty to explore the employee's condition in these cases. *Ibid.*

However, plaintiff's reliance on these cases is misplaced. First, plaintiff's circumstances are wholly distinguishable from the facts presented in *Taylor*, *Bultemeyer*, and *Loulseged*. In these cases, the employees experienced severe symptoms of mental illness resulting in hospitalization or extended disability leave, affirmatively requested accommodations, and/or provided medical restrictions or diagnoses from a medical professional to their employers. In *Loulseged*, a case involving a physical disability, the Fifth Circuit noted this line of reasoning in reference to the level of participation required by the employer and employee during the interactive process once an employee requests an accommodation. *Loulseged*, 178 F.3d at 736 n.5. However, neither the Fifth Circuit nor the other courts cited by plaintiff ever abrogated an employee's duty to affirmatively request an accommodation in some manner. *See Loulseged*, 178 F.3d at 736 n. 4 ("[T]he burden is

16

on the employee to request an accommodation."); *Taylor*, 184 F.3d at 314 ("[T]he school district had more than enough information to put it on notice that Taylor might have a disability, and therefore, in order to trigger the school district's obligation to participate in the interactive process, Taylor or her representative only needed to request accommodation."); *Bultemeyer*, 100 F.3d at 1286 ("While requesting a reasonable accommodation is the employee's responsibility, [defendant] cannot place the whole burden of the interactive process on the shoulders of [plaintiff], who is admittedly suffering from mental problems.").

Here, plaintiff informed defendant he had difficulty reading and writing and was formerly enrolled in special education classes in high school.  While the court does not opine on the severity of his limitations or whether they constitute a disability under the ADA, plaintiff was employed in an unskilled labor position for which reading and writing were not primary functions.  By all accounts, he was able to do all the tasks required for the position without accommodation.  Without his request, there is no reason to expect that defendant should have suggested accommodations or unilaterally implemented adjustments to his work duties.  Therefore, plaintiff's failure to request an accommodation is fatal to his claim.

## C.    Retaliation

Plaintiff claims he was retaliated against by defendant after he reported sexual harassment.  Title VII prohibits an employer from discriminating against an employee because that individual opposed any practice made unlawful under Title VII.  42 U.S.C. § 2000e-3(a).  In order to survive summary judgment in a retaliation case, the plaintiff must make a prima facie showing that:  (1) he engaged in a protected activity; (2) an adverse employment action occurred; and (3) a causal link existed between the protected activity and the adverse action.  *Pineda v. United Parcel Serv., Inc.*,

360 F.3d 483, 487 (5th Cir. 2004).  If the plaintiff meets this requirement, the burden shifts to the defendant to demonstrate a legitimate, non-discriminatory reason for the adverse employment action. *Id.*  The plaintiff then assumes the burden to present proof that the employer's stated reason is pretextual. *Id.*

Under this framework, the employee's ultimate burden is to prove that the adverse employment action taken against the employee would not have occurred "but for" the protected conduct. *Id.*  Plaintiff meets this "but for" requirement by providing "'[p]roof that the defendant's explanation is unworthy of credence.'" *Pennington v. Tex. Dep't. of Family & Protective Services*, 469 Fed. Appx. 332, 337 (5th Cir. 2012) (quoting *Reeves*, 530 U.S. at 147).  This proof may consist of a combination of evidence of temporal proximity, statements indicating hostility for engaging in a protected activity, and other case-specific evidence that suggests that the employer's articulated reason is not true. *See Evans v. City of Houston*, 246 F.3d 344, 356 (5th Cir. 2001) (finding that evidence of backdating of performance reviews and temporal proximity were sufficient evidence of pretext); *Shackelford v. Deloitte & Touche, L.L.P.*, 190 F.3d 398, 409 (5th Cir. 1999) ("Indeed, the combination of suspicious timing with other significant evidence of pretext, can be sufficient to survive summary judgment."); *Shirley v. Chrysler First, Inc.*, 970 F.2d 39, 43 (5th Cir. 1992) (upholding a district court's finding of pretext when a supervisor routinely harassed an employee for filling an EEOC complaint). "Even if a plaintiff's protected conduct is a substantial element in a defendant's decision to terminate an employee, no liability for unlawful retaliation arises if the employee would have been terminated even in the absence of the protected conduct." *Long v. Eastfield Coll.*, 88 F.3d 300, 305 n.4 (5th Cir. 1996).

Defendant concedes, for purposes of summary judgment, that plaintiff has made a prima facie case of retaliation.  Dkt. 28, p. 15.  However, defendant maintains that it has shown a legitimate, non-discriminatory reason for plaintiff's discipline and termination and that plaintiff has failed to show that its reasons were pretext or based on retaliatory motives.  As discussed above in the context of plaintiff's disability discrimination claim, defendant has proffered legitimate, non-discriminatory reasons for plaintiff's termination.

Although it is unclear exactly when the report of sexual harassment occurred based on the record before this court, it appears that plaintiff received two disciplinary actions before the report and two disciplinary actions after the report.  Therefore, the court is unable to find that instances of discipline increased following the report of sexual harassment.  Plaintiff also contends that following the report, Cooper moved him to the day shift and increased his verbal teasing and inappropriate comments directed towards plaintiff.  Cooper does not deny that he made inappropriate comments to plaintiff, but the evidence shows that this was the general tenor of the "shop talk" in the truck shop, and everyone, including plaintiff, engaged in such commentary.[68]  "[P]etty slights, minor annoyances, and simple lack of good manners" does not reach the level of unlawful retaliation. *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68, 126 S. Ct. 2405 (2006).  While Cooper's comments were inappropriate and crude, they did not reflect hostility regarding plaintiff's protected activity and the timing of plaintiff's transfer to the day shift is too unclear for the court to consider proximity in timing as any evidence of retaliation.  Here, there is lack of evidence creating a genuine issue of material fact that the adverse action taken against plaintiff was in any way related

---

[68]  Knight Depo., Exs. 2-3, 6, 10; Cooper Depo., p. 110.

to his report of sexual harassment.  Ultimately, plaintiff has not demonstrated that but for reporting sexual harassment, he would not have been terminated.

### D.    Hostile Work Environment

Finally, plaintiff claims he was subjected to a hostile work environment based on his disability.  To make a prima facie showing of hostile work environment, a plaintiff must show:  (1) he belongs to a protected class; (2) he was subjected to unwelcome harassment; (3) the harassment was based on his membership in the protected class; (4) the harassment affected a term, condition, or privilege of employment; and (5) the employer knew or should have known of the harassment and failed to take adequate remedial action. *Harvill v. Westward Communications, L.L.C.*, 433 F.3d 428, 434 (5th Cir. 2005).  For harassment to affect a term, condition, or privilege of employment, the harassing conduct must be sufficiently severe or pervasive to alter the conditions of employment and create an abusive working environment.  *Aryain v. Wal–Mart Stores Tex. L.P.*, 534 F.3d 473, 479 (5th Cir. 2008).  The work environment must be "both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so." *Faragher v. City of Boca Raton*, 524 U.S. 775, 787, 118 S. Ct. 2275 (1998) (citing *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)).

In determining whether a hostile or abusive work environment exists, a court must assess the totality of the circumstances, including:  (1) the frequency of the conduct; (2) the severity of the conduct; (3) whether the conduct is physically threatening or humiliating, or a mere offensive utterance; and (4) whether the conduct unreasonably interferes with an employee's work performance. *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23, 114 S. Ct. 367 (1993); *Alaniz v. Zamora–Quezada*, 591 F.3d 761, 771 (5th Cir. 2009).  Simple teasing, rude or offensive comments,

20

or isolated incidents will not amount to actionable discrimination. *Harris*, 510 U.S. at 21; *Hockman v. Westward Communications, L.L.C.*, 407 F.3d 317, 326 (5th Cir. 2004). Moreover, implicit or explicit in the comments must be a connotation related to the plaintiff's disability. *Mayberry v. Vought Aircraft Co.*, 55 F.3d 1086, 1091 (5th Cir. 1995). Finally, conclusory allegations of a hostile work environment will not suffice. *Bryan v. Chertoff*, 217 Fed. Appx. 289, 294 (5th Cir. 2007).

Plaintiff has failed to show that the harassment was severe or pervasive or was based on his disability. Plaintiff testified that the harassment began after being moved to the day shift, which occurred around June 2010. He also stated that, at first, the comments did not subjectively affect him, but over time the frequency increased to every other day, and they began to bother him. Additionally, plaintiff stated that Cooper was the only person who harassed him. By all accounts, however, Cooper was rarely at the shop. Plaintiff, himself, testified that Cooper was not there "99% of the time."[69] Cooper's absence from the shop dilutes plaintiff's argument that the harassment was severe. Further, the comments were largely unrelated to plaintiff's alleged disability and were directed at all of the shop employees. Based on these circumstances, the court cannot find a material fact issue that the harassment was based on plaintiff's disability or rose to a level that was severe or pervasive.

Moreover, in association with the employer's failure to take remedial action once being made aware of the harassment, the court also considers the employee's concomitant duty to reasonably take advantage of corrective opportunities provided by the employer. *Hockman*, 407 F.3d at 329; *Woods v. Delta Beverage Group, Inc.*, 274 F.3d 295, 300 n.3 (5th Cir. 2001). In *Hockman*, the court found that the employee unreasonably failed to bring her complaint to a person higher in management,

---

[69] King Depo., p. 155.

although she was dissatisfied with the way her immediate supervisor handled her complaints regarding sexual harassment. *Hockman*, 407 F.3d at 329. Like the plaintiff in *Hockman*, plaintiff here received the company's anti-harassment policy, which outlined the procedures for reporting harassment, plaintiff acknowledged receipt and understanding of the policy after it was read to him by Oder, and despite this knowledge, failed to avail himself of the procedures in place to address such complaints. Plaintiff cannot prove that Sanderson Farms failed to take prompt remedial action where he unreasonably failed to take advantage of corrective opportunities provided by the company.

Plaintiff apparently knew and understood how to report inappropriate comments. He reported Frank Sanford to Cooper and Sanford's immediate boss. Plaintiff also testified that he knew he could contact someone at Sanderson Farms' headquarters in Mississippi, and all he would have to do is ask someone for the number.[70] If the alleged harassment by Cooper severely affected plaintiff's work environment, he could have reported the harassment further up the chain of management, but he failed to do so. Thus, plaintiff has not shown a genuine issue of material fact exists with respect to his hostile work environment claim.

---

[70] *Id.* at p. 37.

## IV.  CONCLUSION

Defendant's motion for summary judgment (Dkt. 28) is GRANTED.   Plaintiff's claims against defendant are hereby DISMISSED WITH PREJUDICE. The court will enter a separate final judgment in accordance with this memorandum opinion and order.

It is so ORDERED.

Signed at Houston, Texas on March 31, 2014.

_____
Gray H. Miller
United States District Judge